EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Carmen Semidey Ramos, Evelyn Amalia Acevedo Semidey, Carlos Ignacio Acevedo Semidey, Emilio Aníbal Torres Rodríguez, Javier Jesús Torres Acevedo, Ana M. Biaggi Cruz, Adriana Acevedo Biaggi, Francis I. Acevedo Biaggi <br><br> Recurridos <br><br> v. <br><br> Farmacia Belmonte y/o Farmacia Belmonte, Inc., David Martínez, Eva Isabel Pesante Fraticelli, la Sociedad de Gananciales compuesta por David Martínez y Eva Isabel Pesante Fraticelli, Universal Insurance Company, Fulano de Tal <br><br> Peticionarios | Certiorari <br><br> 2023 TSPR 15 <br><br> 211 DPR ___ |

Número del Caso:  CC-2021-0883


Fecha:  15 de febrero de 2023


Tribunal de Apelaciones:

Panel Especial


Abogada de la parte peticionaria:

Lcda. Marinés Collado Quiñonez


Abogados de la parte recurrida:

Lcdo. Gerardo E. Tirado Menéndez
Lcdo. Samuel García García


Materia:  Sentencia con Opinión Disidente.


Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Carmen Semidey Ramos, Evelyn Amalia Acevedo Semidey, Carlos Ignacio Acevedo Semidey, Emilio Aníbal Torres Rodríguez, Javier Jesús Torres Acevedo, Ana M. Biaggi Cruz, Adriana Acevedo Biaggi, Francis I. Acevedo Biaggi | | |
| Recurridos | CC-2021-0883 | *Certiorari* |
| v. | | |
| Farmacia Belmonte y/o Farmacia Belmonte, Inc., David Martínez, Eva Isabel Pesante Fraticelli, la Sociedad de Gananciales compuesta por David Martínez y Eva Isabel Pesante Fraticelli, Universal Insurance Company, Fulano de Tal | | |
| Peticionarios | | |

SENTENCIA

En San Juan, Puerto Rico, a 15 de febrero de 2023.

Debemos revisar el dictamen del Tribunal de Apelaciones el cual, entre otras cosas, varió la valoración que hizo el Tribunal de Primera Instancia sobre los daños que sufrieron la Sra. Carmen Semidey Ramos y sus familiares (demandantes-recurridos) tras un incidente relacionado con el despacho de un medicamento. Asimismo, el foro apelativo intermedio omitió

atender el planteamiento sobre la defensa de negligencia comparada de la Farmacia Belmonte y/o Farmacia Belmonte, Inc., el Sr. David Martínez, la Sra. Eva Isabel Pesante Fraticelli, la Sociedad de Gananciales compuesta por ambos y Universal Insurance Company (peticionarios). Por entender que el foro apelativo intermedio erró en parte, modificamos su Sentencia y, así modificada, se confirma.

I

El 10 de marzo de 2014 los demandantes-recurridos presentaron una Demanda contra los peticionarios.[1] Alegaron que la señora Semidey Ramos fue hospitalizada el 23 de febrero de 2013 y dada de alta el 22 de marzo de 2013. Producto de esa hospitalización, a la señora Semidey Ramos se le recetó el medicamento Xarelto. Adujeron que, tras entregar la receta de este a la Farmacia Belmonte, esta no lo despachó. Explicaron que la Farmacia Belmonte no entregó, ni notificó, ni explicó la causa para ello. Esbozaron que, a consecuencia de su omisión, la señora Semidey Ramos no ingirió el medicamento por varios días, lo que le causó que desarrollara una condición de coágulos en la pierna derecha que la llevó a visitar nuevamente el hospital. Además, sostuvieron que la señora Semidey Ramos permaneció encamada, lo que afectó su calidad de vida y le provocó sufrimientos y angustias mentales. De igual forma arguyeron que varios de los familiares se vieron agraviados. A saber: sus hijos, Evelyn

---

[1] *Demanda*, Apéndice del *certiorari*, págs. 36-46.

Acevedo Semidey y Carlos Acevedo Semidey; los cónyuges de estos, Emilio Torres Rodríguez y Ana Biaggi Cruz, respectivamente; y sus nietos, Javier Jesús Torres Acevedo, Adriana Acevedo Biaggi y Francis Acevedo Biaggi. Durante el transcurso del procedimiento judicial, el 19 de marzo de 2015, la señora Semidey Ramos falleció. Posteriormente, los demandantes-recurridos enmendaron su reclamación para añadir esa información.[2]

Por su parte, los peticionarios instaron las alegaciones responsivas correspondientes en las que negaron las imputaciones en su contra y presentaron varias defensas afirmativas, entre estas, la negligencia comparada de los demandantes-recurridos.[3]

Durante la celebración del juicio en su fondo, una vez los demandantes-recurridos terminaron su desfile de prueba, los peticionarios presentaron en corte abierta una moción de desestimación al amparo de la Regla 39.2 (c) de las Reglas de Procedimiento Civil, 32 LPRA Ap. V. Entre otras cosas, argumentaron que, de ser encontrados incursos en responsabilidad civil, también debía considerarse la negligencia comparada de los demandantes-recurridos. Ello, pues estos: (a) no fueron diligentes en la búsqueda del medicamento Xarelto, (b) no revisaron el contenido de las recetas médicas que le fueron entregadas, a pesar de que conocían la necesidad de la señora Semidey Ramos de consumir

---

[2] *Demanda enmendada*, Apéndice del *certiorari*, págs. 47-57.
[3] Apéndice del *certiorari*, págs. 59-71.

el medicamento anticoagulante Xarelto; y (c) tardaron varios días en llevar a la señora Semidey Ramos al hospital después de conocer sobre la hinchazón en su pierna.[4] El foro primario declaró no ha lugar la moción.[5]

Posteriormente, el foro primario dictó una Sentencia el 3 de enero de 2017 (Sentencia de 2017) mediante la cual desestimó con perjuicio la Demanda.[6] En esta formuló, en lo pertinente, las determinaciones de hechos siguientes:

[. . . . . . . . . . . . .]

4. La señora Carmen Semidey era una paciente de 88 años de edad con historial de problemas card[í]acos, hipertensión con evidencia de hipertrofia concéntrica del ventrículo izquierdo, cáncer de colon, hipoadrenalismo, embolias pulmonares, hipertensión pulmonar, historial de trombosis venosa profunda con implantación de un filtro en vena cava.

5. La señora Carmen Semidey Ramos, previo a los hechos de la demanda, era propensa a desarrollar trombos en las extremidades y padecía de embolias pulmonares.

6. La señora Carmen Semidey Ramos estuvo hospitalizada en el Hospital Perea de Mayagüez para los meses de febrero y marzo de 2001 debido a cáncer de colon y embolia pulmonar.

[. . . . . . . . . . . . .]

8. Para el 31 de enero de 2013, la señora Carmen Semidey fue hospitalizada en el Mayagüez Medical Center por una obstrucción intestinal, realizándole una colostomía el día 4 de febrero de 2013.

[. . . . . . . . . . . . .]

---

[4] *Transcripción de la prueba oral*, Apéndice del *certiorari*, pág. 678.
[5] Íd., págs. 685-686.
[6] *Sentencia*, Apéndice del *certiorari*, págs. 72-88.

11. El 23 de febrero de 2013 la señora Carmen Semidey Ramos es llevada nuevamente al Mayagüez Medical Center.

12. En la hospitalización en el Mayagüez Medical Center del 23 de febrero de 2013, se identificó que la señora Carmen Semidey Ramos tuvo múltiples complicaciones: angina inestable, obstrucción intestinal requiriendo una nueva operación, trombosis de vena profunda con inserción de filtro de vena cava, embolias pulmonares múltiples e hipertensión pulmonar, fibrilación atrial paroxística, celulitis, infección de orina y sepsis.

13. Para el 24 de febrero de 2013, se le realizó a la señora Carmen Semidey Ramos un estudio venoso únicamente en su pierna izquierda, del cual surgió que tenía trombosis de vena profunda en etapa aguada y crónica.

14. A la señora Carmen Semidey Ramos se le administraron quince miligramos (15 mg) diarios de Xarelto en la hospitalización del 23 de febrero al 22 de marzo de 2013, pero no se continuó de forma constante, ni en dosis terapéuticas. Hubo ocasiones [en] que se descontinuó la administración del medicamento.

15. El medicamento Xarelto es un anticoagulante.

                [. . . . . . . . . . . . . . .]

19. La señora Semidey presentaba dificultad muscular y ambulatoria, por lo que no podía caminar.

                [. . . . . . . . . . . . . . .]

21. La señora Carmen Semidey fue dada de alta el 22 de marzo de 2013, del Mayagüez Medical Center.

                [. . . . . . . . . . . . . . .]

23. El día 22 de marzo de 2013 cuando se dio de alta a la señora Semidey se entregaron dos recetas prescritas por la Dra. Torres para la señora Carmen Semidey Ramos. Una de las recetas contenía el medicamento Xarelto.

24. Las condiciones de salud que presentó la señora Carmen Semidey Ramos en la hospitalización del 23 de febrero al 22 de marzo de 2013, limitaron aún más su calidad de vida.

25. Luego del alta del 22 de marzo de 2013, la señora Carmen Ramos Semidey salió encamada y se requirió los servicios de un hospicio.

26. La paciente por sus embolias pulmonares tenía su condición pulmonar comprometida lo que causaba que no se pudiera mover mucho porque si no se agitaba y acortaba el aire, necesitando aditamentos médicos para el hogar y oxígeno, entre otros.

27. Se le indicó a la señora Evelyn Acevedo Semidey que la paciente debía ingerir medicamentos anticoagulantes.

[. . . . . . . . . . . . .]

29. El 23 de marzo de 2013 se recibió en la Farmacia Belmonte de Mayagüez una receta prescrita para la señora Carmen Semidey Ramos, que contenía siete medicamentos entre los cuales no había anticoagulantes. [Esta] fue enviada vía facsímil, dicho día, a las diez y cuarenta de la mañana (10:40am), siendo prescrita por la Dra. Torres el día 22 de marzo de 2013 para la señora Carmen Semidey Ramos.

30. El día 23 de marzo de 2013 el señor David Martínez se encontraba trabajando como farmacéutico en el recetario de la Farmacia Belmonte en Mayagüez y procesó la receta prescrita para la señora Carmen Semidey Ramos, enviada vía facsímil dicho día.

31. El señor David Martínez el día 23 de marzo de 2013, mientras ejerció las funciones de su puesto desde que se abrió la farmacia hasta que cerró a las nueve de la noche (9:00 pm), no vio a ningún familiar de la señora Carmen Semidey Ramos en las instalaciones.

32. La señora Evelyn Acevedo Semidey acudió a la Farmacia Belmonte de Mayagüez el 23 de marzo de 2013, luego de haber cerrado el establecimiento, pero que al ser una cliente habitual se le abrió la puerta.

33. En la Farmacia Belmonte de Mayagüez atendieron a la señora Evelyn Acevedo Semidey, a pesar de que ya había culminado su horario de operaciones.

34. La señora Dayanis Cruz Aguilar, técnica de farmacia, fue quien atendió a la señora Evelyn Acevedo Semidey el día 23 de marzo de 2013.

35. Dayanis Cruz Aguilar le entregó los medicamentos de la receta enviada vía facsímil y le informó que como el medicamento Sildenafil estaba prescrito en una dosificación que no viene, le ofrecían varias pastillas, ya que la paciente tenía recetas previas del medicamento.

36. El 23 de marzo de 2013, en horas de la noche, la señora Acevedo Semidey entregó a Dayanis Cruz Aguilar una segunda receta que contenía el medicamento Xarelto. La misma se entregó en horas de la noche (9:15pm), luego del horario de operación de la Farmacia.

37. La técnica de farmacia, Dayanis Cruz Aguilar, le explicó a la señora Evelyn Acevedo Semidey que no se podía procesar ese día la receta que había entregado ya que estaban fuera del horario de funcionamiento y que se procesaría al próximo día laborable. La señora Evelyn Acevedo Semidey le expresó que estaba bien y dejó la receta.

38. La señora Acevedo Semidey dejó dicho día la receta que contenía el medicamento Xarelto, con el conocimiento de que no se procesaría hasta el próximo día laborable.

[. . . . . . . . . . . . . .]

41. La señora Evelyn Acevedo llamó el 26 marzo de 2013 para revisar si la segunda receta entregada el 23 de marzo de 2016, en horas de la noche, se había procesado para despacho.

[. . . . . . . . . . . . . .]

43. [No] es hasta el 28 de marzo de 2013, que […] [un integrante de la familia de la señora semidey Ramos] acude personalmente a la farmacia Belmonte para recoger el contenido de los medicamentos de la segunda receta que entregara en dicha farmacia, que contenía el medicamento Xarelto.

44. El 28 de marzo de 2013 la Farmacia Belmonte Mayagüez, cuando entregó los medicamentos de la segunda receta, no despachó el medicamento Xarelto.

45. Es para el 29 de marzo de 2013 que la señora Evelyn Acevedo Semidey notó que la pierna derecha de la señora Carmen Semidey Ramos estaba hinchada.

46. Los familiares de la paciente esperaron al otro día para llamar a un médico por la queja de la señora Carmen Semidey Ramos.

47. En el ínterin consiguieron una receta del anticoagulante Xarelto prescrita por la Dra. Torres, y se obtuvo el medicamento.

48. El 1 de abril de 2013 se lleva a la señora Carmen Semidey Ramos a la Sala de Emergencia del Mayagüez Medical Center.

49. En Sala de Emergencia del Mayagüez Medical Center los familiares de la señora Carmen Semidey Ramos indicaron que estaba ingiriendo el medicamento Xarelto y mostraron los frascos de los medicamentos.

50. La paciente no fue admitida al Hospital siendo dada de alta de Sala de Emergencia del Mayagüez Medical Center, luego de haberle realizado un estudio venoso y entregado una receta del medicamento anticoagulante Xarelto. Esta visita no fue una hospitalización y, al no presentar una condición de cuidado, se envió al hogar.

51. La señora Semidey fue hospitalizada el 15 de abril de 2013 con sospecha de trombosis de vena profunda, la cual fue descartada luego de realizarle un estudio Doppler venoso. No se sospechó ninguna nueva embolia pulmonar.

52. La señora Carmen Semidey Ramos continuó en el mismo tratamiento y utilizando los servicios de hospicio, como lo hizo desde su alta de la hospitalización que culminó el 22 de marzo de 2013.

53. La señora Carmen Semidey falleció el día 19 de marzo de 2015.

54. El señor Emilio Aníbal Torres Rodríguez describió que la señora Carmen Ramos Semidey Ramos, previo a su fallecimiento en el mes de marzo de 2015, llevaba cinco (5) años encamada.

55. Luego de aquilatada la prueba presentada, este tribunal está convencido de que la parte demandante no estableció que el no haber despachado el medicamento Xarelto tuviera relación causal con los daños reclamados.

56. Las condiciones de salud de la señora Carmen Semidey Ramos, así como el estar encamada, recibir servicios de hospicio y tener que estar asistida por aditamentos para respiración y otros para mejorar su calidad de vida, se debieron a sus enfermedades preexistentes y la hospitalización del 23 de febrero al 22 de marzo de 2013.

57. Igualmente, este tribunal está convencido de que la parte demandante no probó que la causa eficiente de sus daños fuera la acción u omisión de los demandados al no despachar el medicamento Xarelto.

[. . . . . . . . . . . . . .][7]

El foro primario concluyó que los demandantes-recurridos no demostraron el nexo causal entre la conducta presuntamente negligente de la Farmacia Belmonte y los daños alegados, según requiere el Artículo 1802 del Código Civil de 1930, 31 LPRA ant. sec. 5141.

Inconformes, los demandantes-recurridos acudieron al Tribunal de Apelaciones mediante un recurso de apelación. El 19 de junio de 2018 el foro apelativo intermedio emitió una Sentencia mediante la cual revocó el dictamen del foro primario al concluir que los demandantes-recurridos sí establecieron el nexo causal.[8] Entendió que la omisión de la Farmacia Belmonte en despachar el medicamento a la señora Semidey Ramos por espacio de aproximadamente tres días produjo otro evento trombo embólico lo cual la llevó al hospital nuevamente. Además, determinó que este suceso le generó a la señora Semidey Ramos tristeza, frustración y vergüenza.[9] Con base en ello, el foro apelativo intermedio devolvió el caso al foro primario para que realizara la valoración de los daños correspondiente.[10]

---

[7] Íd., págs. 77-82.
[8] Sentencia, Apéndice del certiorari, págs. 1050-1070.
[9] Íd., págs. 1065-1070.
[10] En este dictamen, el Tribunal de Apelaciones no consideró ni pasó juicio sobre el planteamiento de los peticionarios —que surgía del récord ante sí— atinente a la negligencia

Así las cosas, la sala de instancia celebró varias vistas con el fin de recibir el insumo de las partes sobre la valoración de los daños.[11] Como resultado, el 4 de febrero de 2020 emitió una Sentencia Enmendada mediante la cual concedió una indemnización global de **$705,000**, a distribuirse de la manera siguiente:

| | |
|---|---|
| **Carmen Semidey Ramos** | **$468,000** |
| **Evelyn Acevedo Semidey** | **$75,000** |
| **Emilio Torres Rodríguez** | **$35,000** |
| **S.L.G. Torres-Acevedo** | **$25,000** |
| **Carlos Acevedo Semidey** | **$42,000** |
| **Ana Biaggi Cruz** | **$35,000** |
| **Francis Acevedo Biaggi** | **$25,000**[12] |

Asimismo, el foro primario otorgó a los demandantes-recurridos una partida de costas por la cantidad de $7,586.[13]

En desacuerdo, los peticionarios incoaron un recurso de apelación ante el foro apelativo intermedio. Enunciaron,

---

comparada de los demandantes-recurridos. No se hizo mención alguna al respecto en la Sentencia.

[11] Las partes también sometieron por escrito sus respectivas posturas en cuanto a la valoración y cuantía de los daños. Véase: Apéndice, págs. 1081-1107. **En el escrito que los peticionarios presentaron a estos efectos reiteraron su argumento sobre la negligencia comparada de los demandantes-recurridos y que ello también se debía considerar para fines de la valoración de los daños. Apéndice, págs. 1081-1097.**

[12] *Sentencia Enmendada*, Apéndice del *certiorari*, págs. 33-35. Javier Jesús Torres Acevedo y Adriana Acevedo Biaggi, quienes figuraron como codemandantes en la Demanda, renunciaron a sus respectivas causas de acción. Véase: Apéndice del *certiorari*, pág. 77.

[13] Los demandantes-recurridos presentaron ante el foro primario un escrito en el que solicitaron costas por $7,586. Véase, *Memorando de costas*, Apéndice del *certiorari*, págs. 1071-1072.

esencialmente, que la compensación concedida a los demandantes-recurridos fue exageradamente alta dadas las circunstancias del caso. Asimismo, esbozaron que el foro primario debió imponerles responsabilidad a los demandantes-recurridos en concepto de negligencia comparada. En ese sentido, enfatizaron que se les debió fijar a los demandantes-recurridos el porciento de responsabilidad a tono con su propia negligencia. También adujeron que no procedía conceder costas por honorarios de peritos, según las solicitaron los demandantes-recurridos en el memorando de costas que presentaron ante el foro primario.

Así las cosas, el 30 de noviembre de 2021 el Tribunal de Apelaciones emitió una Sentencia mediante la cual modificó el dictamen recurrido.[14] Determinó que las compensaciones de la señora Semidey Ramos y la señora Acevedo Semidey eran exageradamente altas. Por tal razón, las redujo a **$225,000** y **$58,000**, respectivamente. Así modificadas, confirmó el resto de los daños. En cuanto a la argumentación de los peticionarios de la negligencia comparada, dispuso que no la consideraría, pues, en la Sentencia previa del otro panel apelativo tampoco se consideró y que ello implicaría relitigar el pleito. Asimismo, que el foro primario determinó que esa última Sentencia era la ley del caso y que expresó que, como inicialmente declaró no ha lugar la demanda y no pasó juicio sobre la cuestión de negligencia comparada, no

---

[14] *Sentencia*, Apéndice del *certiorari*, págs. 2-31

procedía atenderla. Sobre el asunto de las costas, consideró que eran razonables y que el foro primario, al concederlas, no abusó de su discreción ni incurrió en pasión, prejuicio o error.

Aún insatisfechos, los peticionarios recurrieron ante nos mediante el presente recurso de *certiorari* en el que señalaron los errores siguientes:

> Erró el Tribunal de Apelaciones al modificar la sentencia enmendada a los únicos efectos de disminuir las cuantías concedidas a solo dos de los demandantes, cuando las concedidas a todos los componentes de la parte demandante fueron exageradamente altas y se apartaron de la jurisprudencia y la metodología vigente sobre la valoración de daños y no fueron cónsonas con la prueba desfilada.
>
> Erró el Tribunal de Apelaciones al no considerar el porciento de responsabilidad que fuera atribuido a la Farmacia Belmonte por estos, cuando se determinó la cuantía de daños por la cual debían ser resarcidos.
>
> Erró el Tribunal de Apelaciones al mantener costas que eran innecesarias para la tramitación del pleito.

Trabada así la controversia, disponemos del recurso de epígrafe.

**II**

**A. Estándar de revisión de la apreciación de la prueba testifical**

Nuestro esquema jurídico está revestido por un manto de deferencia hacia la apreciación que realizan los jueces y las juezas de primera instancia en cuanto a la prueba testifical. En ese sentido, hemos enunciado que "[l]a tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en

gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". <u>Gómez Márquez v. Periódico El Oriental Inc.</u>, 203 DPR 783, 792 (2020).

En atención a esto, los tribunales apelativos no intervendremos con "[l]a apreciación de la prueba, la adjudicación de credibilidad y las determinaciones de hechos que realizan los tribunales de instancia, a menos que se demuestre que el juzgador actuó movido por pasión, prejuicio o parcialidad o que incurrió en error manifiesto". <u>Íd.</u>, pág. 793. En particular, **se incurre en un error manifiesto cuando la apreciación de esa prueba se distancia de la realidad fáctica o es inherentemente imposible o increíble**. <u>Íd.</u>, pág. 793-794. **Ello es particularmente cierto cuando el tribunal descansa exclusivamente en una parte de la prueba, mientras hubo otra prueba que la contradijera**. <u>Íd.</u> Este estándar de revisión restringe la facultad del foro apelativo para sustituir el criterio del foro revisado a escenarios en que, de la prueba admitida, no exista base suficiente que apoye su determinación. Diferencias de criterio jurídico no alcanzan ese estándar. <u>Íd.</u> En lo que concierne a la controversia ante nos, la utilización de este estándar de revisión apelativa no se da en un vacío. La valoración de los daños que realizan los foros primarios se cimienta en la apreciación que estos hagan de la prueba que se haya desfilado ante sí.

**B. La valoración de los daños**

Cónsono con lo anterior, hemos manifestado que, particularmente en casos de daños y perjuicios, la tarea de estimar y valorar daños es una labor difícil, ardua y angustiosa, ya que no existen fórmulas científicas de especificidad exacta que indiquen cómo se justiprecia el dolor y el sufrimiento. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, 179 DPR 774,791 (2010); Vázquez Figueroa v. ELA, 172 DPR 150, 154 (2007); Nieves Cruz v. UPR, 151 DPR 150, 169-170 (2000). Véase también: Santiago Montañez v. Fresenius Medical, 195 DPR 476, 490 (2016) ("[N]o existe un sistema de computación que permita llegar a un resultado exacto con el cual todas las partes queden complacidas y satisfechas").

La valoración del daño descansa en la discreción, prudencia, juicio y razonabilidad del juzgador o la juzgadora de hechos motivado por un sentido de justicia y de conciencia humana. Urrutia v. AAA, 103 DPR 643, 647-648 (1975). **Esta responde a factores únicos de cada caso, por lo que debe ser considerada conforme a los hechos y circunstancias particulares de la situación fáctica.** Véase: Nieves Cruz v. UPR, supra, pág. 177.

El daño a ser compensado no puede sobrevalorarse ni subvalorarse meramente por el carácter especulativo que conlleve necesariamente el cómputo. Claro está, al medirlos, el juzgador o la juzgadora debe hacerlo a base de la prueba, procurando siempre que la indemnización no se convierta en una industria y se mantenga su sentido

remediador, no punitivo. Véase: Rodríguez Báez v. Nationwide Insurance Co., 156 DPR 614, 628 (2002). De modo que, los tribunales deben buscar una **proporción razonable** entre el daño causado y la indemnización concedida, de suerte que la adjudicación sea balanceada, es decir, ni extremadamente baja ni desproporcionadamente alta. Blás v. Hosp. Guadalupe, 146 DPR 267, 339 (1998).

**C. El estándar de revisión de la valoración de los daños**

Precisamente por la dificultad que entraña valorar los daños, existe una norma de abstención judicial de parte de los foros apelativos fundada en criterios de estabilidad y deferencia a los tribunales de instancia. Urrutia v. AAA, supra, págs. 647-648. En ese sentido, los tribunales apelativos no debemos intervenir con la apreciación de la prueba y con la valoración de daños que un tribunal de instancia haya realizado, **a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas**. Santiago Montañez v. Fresenius Medical, supra, pág. 490; Meléndez Vega v. El Vocero de PR, 189 DPR 123, 203 (2013). Ello responde a que los jueces y las juezas de instancia están en mejor posición que los tribunales apelativos para evaluar los daños, toda vez que estos son los que tienen contacto directo con la prueba presentada. Blás v. Hosp. Guadalupe, supra, pág. 339.

Este Tribunal ha sido consecuente en establecer que "para evaluar si la compensación concedida por el Tribunal de Primera Instancia es ridículamente baja o exageradamente

alta, debemos examinar la prueba desfilada ante ese foro y las cuantías otorgadas en casos similares resueltos anteriormente". Santiago Montañez v. Fresenius Medical, supra, pág. 491 ("[L]as indemnizaciones concedidas en casos anteriores constituyen un punto de partida y referencia útil para pasar juicio sobre las concesiones otorgadas por el foro primario"). Véase también: Herrera, Rivera v. S.L.G. Ramírez-Vicéns, supra, pág. 785. "En todo caso, estas compensaciones otorgadas en casos anteriores deben ajustarse a su valor presente", pues deben ser atemperadas a la realidad económica del momento en que la compensación habrá de ser concedida. Santiago Montañez v. Fresenius Medical, supra, pág. 491.

El juzgador o la juzgadora tiene la obligación de especificar la jurisprudencia que haya usado como guía para valorar los daños al igual que el cómputo realizado para ajustar las cuantías de casos anteriores a su valor actual y el caso que se encuentre adjudicando. "[E]s forzoso explicar qué casos se utilizan como referencia y cómo las cuantías concedidas se ajustan en esos casos anteriores al caso que el tribunal tiene ante su consideración". Íd., pág. 493.

**D. La doctrina de negligencia comparada**

El Artículo 1802 del Código Civil de 1930 —aplicable a los hechos de este caso—, 31 LPRA ant. sec. 5141, establece que la persona que por acción u omisión cause daño a otra, estará obligada a reparar el daño causado, siempre que concurran los siguientes tres elementos básicos: (1) la

presencia de un daño físico o emocional en la parte demandante, (2) que haya surgido a raíz de un acto u omisión culposa o negligente de la parte demandada, y (3) que exista un nexo causal entre el daño sufrido y dicho acto u omisión.

Asimismo, este artículo reconoce la defensa de negligencia comparada al disponer que "[l]a imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización". Íd. Sobre dicha defensa, este Tribunal ha establecido que su efecto es atenuar la responsabilidad de la parte demandada, tomando en cuenta "el grado de negligencia desplegado por la parte demandante que contribuye a la producción de sus propios daños". Colón Santos v. Coop. Seg. Mult. P.R., 173 DPR 170, 178 (2008). Es decir, la defensa de negligencia comparada no pretende eximir de responsabilidad a la parte demandada, sino reducirla. Véase: SLG Colón Rivas v. ELA, 196 DPR 855, 865 (2016).

En aquellos casos en que haya una alegación fundamentada de negligencia comparada, "el tribunal está llamado a individualizar las indemnizaciones por daños, colocando el rigor económico en las partes conforme a la proporción de su descuido o negligencia". Colón Santos v. Coop. Seg. Mult. P.R., supra, pág. 178 (citando a H.M. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, 2da ed., San Juan, Pubs. JTS, 1986, Vol. I, pág. 410). De esta forma, el juzgador, luego de analizar todos los hechos y circunstancias del caso, tiene la tarea de "determinar el monto de la compensación y el porciento de responsabilidad que

corresponde a cada parte, restando de la compensación total la fracción de responsabilidad correspondiente a la parte demandante". Íd., pág. 178. Véase también: SLG Colón Rivas v. ELA, supra, págs. 865-866.

### E. La concesión de costas en un proceso judicial

La Regla 44.1 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1, rige la concesión de costas en nuestro ordenamiento. Específicamente, establece en lo pertinente:

> (a) Su concesión. Las costas se concederán a la parte a cuyo favor se resuelva el pleito o se dicte sentencia en apelación o revisión, excepto en aquellos casos en que se disponga lo contrario por ley o por estas reglas. Las costas que podrá conceder el tribunal son los gastos en que se incurra necesariamente en la tramitación de un pleito o procedimiento que la ley ordena o que el tribunal, en su discreción, estima que una parte litigante debe reembolsar a otra. Íd.

"Esta disposición tiene una función reparadora, ya que permite el reembolso de los gastos necesarios y razonables que tuvo que incurrir la parte prevaleciente del pleito en su tramitación". Rosario Domínguez v. ELA, 198 DPR 197, 211 (2017). Véase también: Maderas Tratadas v. Sun Alliance et al., 185 DPR 880, 934 (2012); Auto Servi, Inc. v. ELA, 142 DPR 321, 326 (1997). De esta forma, su derecho no queda "menguado por los gastos que tuvo que incurrir sin su culpa y por culpa del adversario". Maderas Tratadas v. Sun Alliance et al., supra, pág. 934 (citando a J.T.P. Dev. Corp. v. Majestic Realty Corp., supra, pág. 460).

Una vez se reclaman, la imposición de costas a favor de la parte victoriosa es mandatoria. Rosario Domínguez v. ELA, supra, pág. 212. No obstante, su concesión no opera de forma

automática, ya que tiene que presentarse oportunamente un memorando de costas en el que se precisen los gastos incurridos. Colón Santos v. Coop. Seg. Mult. P.R., 173 DPR 170, 187 (2008). Además, el tribunal tiene discreción amplia para evaluar la razonabilidad y determinar la necesidad de los gastos detallados. Maderas Tratadas v. Sun Alliance et al., supra, pág. 935. Esta discreción se ejercerá con moderación, y se examinará cuidadosamente el memorando de costas en cada caso.[15]

Para fines de esta regla, son recobrables aquellos gastos incurridos necesariamente en la tramitación del pleito. J.T.P. Development Corp. v. Majestic Realty Corp., supra, pág. 460. Así, quedan excluidos aquellos gastos innecesarios, superfluos o extravagantes. Maderas Tratadas v. Sun Alliance et al., supra, pág. 935.

**III**

**A. Primer y segundo señalamiento de error**

Para atender de manera cabal este recurso, es meritorio discutir en conjunto el primer y segundo señalamiento de error por estar estrechamente relacionados.

---

[15] Recuérdese que es norma reiterada que, "de ordinario, este Tribunal no intervendrá con el ejercicio de la discreción de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial". Lluch V. España Service, 117 DPR 729, 745 (1986). Véase también: García v. Asociación, 165 DPR 311, 322 (2005).

Mediante su primer señalamiento de error, los peticionarios sostienen que el foro apelativo intermedio erró al modificar únicamente las cuantías de daños concedidas a dos de los demandantes-recurridos. Precisan que, aún con la modificación realizada, la valoración de los daños que hizo el foro primario no es cónsona con la prueba desfilada ni tiene apoyo en la doctrina jurisprudencial vigente. Añaden que la compensación concedida a los demandantes-recurridos, al haberse utilizado como base un caso que no es comparable con la situación fáctica presente, resultó desproporcionada y exageradamente alta. **Suscribimos este señalamiento.**

Tras una evaluación detenida de los planteamientos de las partes, la prueba que obra en el expediente y de nuestros pronunciamientos previos en esta área, procede que se varíe la compensación concedida a todos los demandantes-recurridos. **Los foros inferiores incurrieron en error manifiesto y su apreciación de la prueba y consecuente valoración de los daños no merece nuestra deferencia.** Las cuantías otorgadas en concepto de daños a favor de los demandantes-recurridos son exageradamente altas y no guardan proporción con la prueba desfilada ni con los daños alegados a raíz de la conducta negligente de los peticionarios.

Ahora bien, en unión a lo anterior, en su segundo señalamiento de error los peticionarios plantean que, además de atender la valoración de los daños, los foros inferiores debieron considerar su defensa de negligencia comparada, con el fin de imponerles un por ciento de responsabilidad a los

demandantes-recurridos. Sostienen que los demandantes-recurridos también fueron negligentes, por lo que no les corresponde satisfacer la totalidad de los daños.

Por su parte, y sobre este extremo, los demandantes-recurridos esbozan que, mediante este señalamiento, los peticionarios pretenden relitigar el pleito. Según argumentan, los peticionarios no han utilizado la defensa afirmativa de negligencia comparada, ni esta ha sido discutida por ellos ni por ningún tribunal.[16] **Un examen minucioso del expediente ante nos revela que a los demandantes-recurridos no les asiste la razón.**

Es indiscutible que el planteamiento de negligencia comparada de los peticionarios no ha sido objeto de consideración por parte de los foros inferiores, aun cuando estos lo han presentado desde el comienzo. Cuando el foro primario inicialmente dilucidó el pleito, no tuvo que pasar juicio sobre la defensa que esgrimieron los peticionarios, pues la demanda se desestimó. Posteriormente, cuando el foro apelativo intermedio tuvo el caso ante sí por primera vez, tampoco se expresó sobre este asunto, a pesar de que la argumentación sobre la negligencia comparada dimanaba del récord y la transcripción ante sí. De todas formas, en ese instante, el foro apelativo intermedio no tenía por qué manifestarse al respecto, pues lo que estaba revisando era el

---

[16] *Alegato de la parte demandante-recurrida*, pág. 25.

dictamen desestimatorio del foro primario a la luz de los planteamientos de los demandantes-recurridos.

Por otro lado, una vez devuelto el caso al foro primario para que se realizara la valoración de los daños, si bien los peticionarios reiteraron su argumentación, este decidió no atender la cuestión. Igual suerte corrió en la Sentencia recurrida del foro apelativo intermedio —la cual es objeto de revisión a través del recurso de epígrafe—, donde simple y llanamente se pasó por alto lo relativo a la defensa de negligencia comparada. En resumidas cuentas, no ha habido un pronunciamiento por parte de un tribunal donde se hayan considerado y decidido los méritos o deméritos de la alocución de los peticionarios sobre este asunto. Por ello, estando en posición de hacerlo, nos corresponde expresarnos y atender igualmente este señalamiento de error de los peticionarios. **Al así emprender esta tarea, colegimos que, según surge del contenido del récord ante nos, procede imponerles a los demandantes-recurridos un por ciento de responsabilidad pues, con su propia negligencia, contribuyeron a la producción de sus daños.**

A continuación, pormenorizamos cada una de las partidas y discutimos, a su vez, la negligencia de los demandantes-recurridos y el por ciento de responsabilidad que les corresponde.

### i.   Sra. Carmen Semidey Ramos

La médula de este caso gira alrededor de la situación que ocurrió con la señora Semidey Ramos. Por ello, es

necesario tomar en cuenta su estado antes del agravio, su naturaleza y magnitud, y su condición resultante tras el incidente culposo.[17]

Según surge de las determinaciones de hechos de la Sentencia de 2017 del foro primario, previo a los hechos de la Demanda que originó esta controversia, la señora Semidey Ramos —de 88 años— **tenía un historial de múltiples condiciones de salud**, era propensa a desarrollar trombos en las extremidades y padecía de embolias pulmonares. Asimismo, **fue hospitalizada en un sinnúmero de ocasiones**. Justo **antes** del evento que redundó en los daños objeto de revisión en este recurso, esta fue ingresada al hospital nuevamente el 23 de febrero de 2013 con un cuadro de: angina inestable, obstrucción intestinal, trombosis de vena profunda, embolias pulmonares, hipertensión pulmonar, entre otros padecimientos. Esta fue tratada y dada de alta el 22 de marzo de 2013. Debido a las condiciones que la señora Semidey Ramos exhibió durante esa hospitalización, esta tenía una **calidad de vida disminuida**.[18] Además, sus padecimientos eran **severos**, **limitantes** y estuvo **agudamente enferma**.[19] Cuando se le dio de

---

[17] Como bien discute el tratadista Antonio J. Amadeo Murga, "[al] momento de evaluar la situación de hechos para conceder la indemnización adecuada, el juzgador debe determinar el estado en que se encontraba el sujeto que sufrió el daño antes de sufrirlo y compararlo con el estado en que quedó luego de ocurrido el daño […]". A.J. Amadeo Murga, El valor de los daños en la responsabilidad civil, 3ra ed., Barcelona, Ed. Bosch, 2019, pág. 16.

[18] *Transcripción de la prueba oral*, Apéndice del *certiorari*, pág. 324.

[19] Íd., pág. 334. Incluso, la hija de la señora Semidey Ramos y cuidadora principal, la Sra. Evelyn Acevedo Semidey,

alta, ella salió encamada para su hogar y requirió los servicios de un hospicio.[20] Dado que, por sus embolias pulmonares, aún tenía su condición pulmonar comprometida, no podía realizar muchos movimientos porque podía acortársele el aire. Por esa razón, requirió varios aditamentos médicos para su hogar, entre estos, oxígeno.

Descrito el estado de la señora Semidey Ramos **previo** al incidente que generó los daños reclamados, examinemos el cuadro fáctico que los originó. Cuando a esta se le dio el alta de la referida hospitalización el 22 de marzo de 2013, se le entregaron —por conducto de la señora Acevedo Semidey— dos recetas. Ambas tenían múltiples medicamentos prescritos, entre los cuales se hallaba el medicamento Xarelto, un

---

testificó que, durante la hospitalización de febrero a marzo de 2013, su madre estuvo "gravemente enferma". Íd., pág. 592.

[20] El yerno de la señora Semidey Ramos y esposo de la señora Acevedo Semidey, el Sr. Emilio Torres Rodríguez, declaró que, tras el alta de la hospitalización en marzo de 2013, la señora Semidey Ramos:

> Tuvo que confinarse a una cama donde tenía un sistema con oxígeno y tenía que subirle y bajarle la cama de posiciones cada vez que ella, pues, se quejaba de dolores y suministrarle las medicinas y no se veía físicamente, pues, en el estado que estaba antes, más de un cincuenta por ciento de deterioro de su salud. Íd., pág. 621.

Es importante añadir que, según se desprende de las determinaciones de hechos de la Sentencia del Tribunal de Primera Instancia de 3 de enero de 2017, la señora Semidey Ramos, previo a su fallecimiento, estuvo **cinco (5) años encamada. Ello quiere decir que estuvo encamada desde antes de su hospitalización de febrero a marzo de 2013.** Véase: *Sentencia* del Tribunal de Primera Instancia de 3 de enero de 2017, Apéndice del *certiorari*, pág. 81.

anticoagulante.[21] El próximo día —el 23 de marzo de 2013— la señora Acevedo Semidey, en horas de la mañana, envió a la Farmacia Belmonte vía facsímil **una** de las dos recetas.[22] Luego, en horas de la noche de ese día, acudió a la Farmacia Belmonte a recoger los medicamentos de la receta que envió por medio de facsímil.[23] Al llegar, la Farmacia Belmonte estaba cerrada, pues ya había transcurrido su horario de operación.[24] No obstante, como la señora Acevedo Semidey era clienta asidua de este negocio —y como todavía había personal allí—, se le permitió acceso y se dirigió al área del recetario.[25] La técnica de farmacia de turno le entregó los medicamentos de la primera receta, excepto el medicamento Sildenafil, el cual requería aprobación del plan médico, lo cual se le indicó a la señora Acevedo Semidey.[26] Ante ello, la señora Acevedo Semidey solicitó que al menos se le vendieran varias tabletas del medicamento Sildenafil, para comenzárselo a la señora Semidey Ramos en lo que se finiquitaba lo de la aprobación. Así se hizo y esta las adquirió con dinero en efectivo.[27]

---

[21] Véase: *Sentencia* del Tribunal de Primera Instancia de 3 de enero de 2017, Apéndice del *certiorari*, págs. 78-79

[22] **La receta que se envió mediante facsímil no contenía el medicamento Xarelto**. Véase: *Transcripción de la prueba oral*, Apéndice del *certiorari*, págs. 704-707, 719-720.

[23] Íd., pág. 759.

[24] Íd.

[25] Íd., págs. 704-759.

[26] *Reporte de Incidente*, Apéndice del *certiorari*, pág. 961.

[27] *Transcripción de la prueba oral*, Apéndice del *certiorari*, pág. 581.

Acto seguido, la señora Acevedo Semidey le hizo entrega de la segunda receta a la técnica de farmacia que contenía el medicamento Xarelto.[28] Esta le hizo saber a la señora Acevedo Semidey que no podía recibirle la receta pues la Farmacia Belmonte ya había cerrado y no le podía despachar los medicamentos.[29] Agregó que —a esa hora— no había un farmacéutico que verificara la receta y que el sistema computarizado mediante el cual estas se procesaban ya había sido cerrado.[30] No obstante, **a insistencias de la señora Acevedo Semidey**, la técnica de farmacia retuvo la receta, pero le indicó que se procesaría el próximo día.[31]

Tres (3) días después —es decir, el 26 de marzo de 2013— la señora Acevedo Semidey se comunicó con la Farmacia Belmonte para conocer el estatus de la receta que había dejado el 23 de marzo de 2013 en horas de la noche.[32] En la Farmacia Belmonte le indicaron que la receta no se había procesado aún, que desconocían el porqué, pero que procederían a procesarla lo más pronto posible.[33] Así las cosas, esta receta

---

[28] Íd., pág. 759.
[29] Íd., págs. 759-760.
[30] Íd.
[31] Íd., págs. 716, 759-760.
[32] *Reporte de Incidente*, Apéndice del *certiorari*, págs. 961-962.
[33] *Reporte de Incidente*, Apéndice del *certiorari*, pág. 961. Según se desprende del *Reporte de Incidente* que la Farmacia Belmonte preparó a consecuencia de estos hechos —y que fue admitido como exhibit ante la sala sentenciadora—, la receta se traspapeló con las otras que estaban pendientes de autorización y logró ser localizada a raíz de la llamada de la señora Acevedo Semidey el 26 de marzo de 2013. Íd.

—que contenía nueve (9) medicamentos en total—[34] se procesó ese mismo día, y solo se pudieron procesar cinco (5), pues para tres (3) de los medicamentos ya se había llevado otra receta recientemente, y no se le podían despachar porque entre la receta anterior y la actual había transcurrido poco tiempo para realizar un *refill* de estos.[35] El otro medicamento que no se pudo procesar —y que, por consiguiente, no se despachó— era el Xarelto, pues requería autorización del plan médico. La Farmacia Belmonte sometió la solicitud de autorización ante el plan médico. No se le mencionó lo anterior a ninguno de los familiares de la señora Semidey Ramos.[36]

Dos (2) días luego —el 28 de marzo de 2013— el señor Emilio Torres Rodríguez acudió a la Farmacia Belmonte a recoger los medicamentos de la segunda receta.[37] A este tampoco se le señaló que no se había despachado el medicamento Xarelto o que requería autorización del plan médico.

En los días subsiguientes, la señora Semidey Ramos manifestó que no podía respirar y que se le estaban hinchando las piernas.[38] Fue en ese instante que la señora Acevedo Semidey se cuestionó si se le estaba administrando el medicamento Xarelto y finalmente se dio cuenta de que la

---

[34] *Transcripción de la prueba oral*, Apéndice del *certiorari*, pág. 719. Véase también: Apéndice del *certiorari*, pág. 965.
[35] *Transcripción de la prueba oral*, Apéndice del *certiorari*, pág. 721.
[36] Íd., págs. 731-732. Véase también: Apéndice del *certiorari*, pág. 962.
[37] *Transcripción de la prueba oral*, Apéndice del *certiorari*, pág. 720.
[38] Íd., pág. 583.

Farmacia Belmonte no se lo había despachado.[39] A tal efecto, la señora Acevedo Semidey consiguió otra receta del medicamento Xarelto, la llevó a otra farmacia el 31 de marzo de 2013, y se le despachó y administró a la señora Semidey Ramos ese mismo día.[40] Posteriormente, la señora Semidey Ramos tuvo que ser llevada al hospital el 1 de abril de 2013.[41]

Como se puede apreciar, la señora Semidey Ramos no ingirió el medicamento Xarelto por varios días. Ello se debió, en parte, a que la Farmacia Belmonte no lo despachó y no le informó a la señora Acevedo Semidey para que esta buscara una alternativa. El Tribunal de Apelaciones encontró que esa fue la conducta negligente de la Farmacia Belmonte.[42] La próxima cuestión a dilucidar es qué daños, si algunos, le ocasionó esa omisión a la señora Semidey Ramos.

Los demandantes-recurridos alegaron en su Demanda que la conducta de la Farmacia Belmonte le ocasionó los daños siguientes a la señora Semidey Ramos: (a) tuvo que ser hospitalizada el 1 y el 15 de abril de 2013, "experimentando […] intensos sufrimientos físicos, preocupaciones y angustias mentales[,]y estuvo en riesgo de sufrir una embolia

---

[39] Íd.
[40] Íd., págs. 589-590.
[41] Cabe precisar que, de conformidad con el *Reporte de Incidente*, el 1 de abril de 2013 "la señora [Acevedo Semidey] llam[ó] a la farmacia muy molesta porque no se le había despachado el Xarelto y que no se le había notificado nada de la autorización para ella comprar algunos en efectivo en lo que se lo aprobaba el plan. Que su mamá necesitaba este medicamento para evitar coágulos y que, al no tomarlos, tuvo que llevarla a la clínica por un coágulo en la pierna". *Reporte de Incidente*, Apéndice del *certiorari*, pág. 962.
[42] *Apéndice del certiorari*, pág. 1064.

pulmonar";[43] y (b) "[d]ebido a la agravación del desarrollo de coágulos en [sus] piernas […], [de ser] una persona funcional e independiente[,] se convirtió en una persona impedida y totalmente dependiente y […]postrada en [una] cama […]".[44]

Todos los daños alegados **no** guardan apoyo en la prueba desfilada ante la sala de instancia. Los únicos daños que experimentó la señora Semidey Ramos —y por los cuales se le compensará de conformidad—, y que en efecto se probaron, fueron: (a) los malestares, dolores y problemas para respirar que le causó no ingerir el medicamento Xarelto y (b) la hinchazón en la pierna derecha que la llevó a visitar el hospital el 1 de abril de 2013, lo que terminó siendo diagnosticado como tromboflebitis aguda.[45] Dicha condición fue causada por no estar en el tratamiento de anticoagulante —Xarelto— durante los días anteriores.[46] En ese sentido, corresponde hacer una serie de aclaraciones. Primero, cuando la señora Semidey Ramos acudió al hospital el 1 de abril de 2013, a esta se le atendió y despachó el mismo día; no se le admitió para ser hospitalizada.[47] Segundo, la otra visita que

---

[43] *Demanda enmendada*, Apéndice del *certiorari*, págs. 52-53.
[44] Íd.
[45] *Transcripción de la prueba oral*, Apéndice del *certiorari*, pág. 341. Según el testimonio del Dr. Luis O. Ramírez Ferrer, perito de ocurrencia de los demandantes-recurridos y uno de los doctores que la atendió, la señora Semidey Ramos tenía la pierna derecha hinchada, con edema, color rojo y le causaba dolor. Íd. Véase también: Apéndice del *certiorari*, págs. 297, 490-501, 807.
[46] Íd., págs. 342, 490-501.
[47] Íd., pág. 305.

esta realizó al hospital el 15 de abril de 2013 en nada se relaciona con el evento de la no ingesta del medicamento Xarelto.[48] Tercero, del expediente no se desprende —ni de los testimonios de los peritos ni de sus respectivos informes periciales—, en forma alguna, que la no ingesta del medicamento Xarelto haya agravado la condición general de la señora Semidey Ramos, haya causado que permaneciera encamada o le haya ocasionado la muerte dos años luego de estos hechos. Obsérvese que de por sí los padecimientos de la señora Semidey Ramos eran lo suficientemente agudos para permanecer encamada y, además, del récord ante nos no surge cuál fue su causa de muerte.

En vista de lo anterior, y aclarado el alcance y magnitud de los daños sufridos por la señora Semidey Ramos, **a esta solo se le debe compensar por las dolencias físicas, incomodidades y angustias mentales sufridas por la no ingesta del medicamento Xarelto.** Por ello, nos resulta incorrecto que el foro apelativo intermedio haya considerado comparable el caso de Santiago Montañez v. Fresenius Medical, supra, para

---

[48] De acuerdo con diversos testimonios, la visita al hospital de 15 de abril de 2013 se relacionó con las condiciones que la señora Semidey Ramos exhibió durante su hospitalización de febrero a marzo de 2013, y no con la no ingesta del medicamento Xarelto. Íd., págs. 337-338, 813-814. Incluso, el Dr. Edwin Miranda Aponte, perito de negligencia de los demandantes-recurridos, en su análisis del caso para emitir su opinión, no tomó en consideración el récord de la hospitalización del 15 de abril de 2013 por entender que no se relacionaba con los daños sufridos por la señora Semidey Ramos. Véase: *Transcripción de la prueba oral*, Íd., págs. 472-473, 510.

valorar los daños.[49] Ello, habida cuenta de que, mientras en la situación fáctica de ese caso los daños sufridos por la principal agraviada fueron catastróficos, en este, la señora Semidey Ramos no tuvo daños de gran severidad. Debemos, pues, tomar en cuenta ese último elemento y que la señora Semidey Ramos tenía una edad avanzada y múltiples condiciones de salud preexistentes que disminuyeron su calidad de vida. No se trataba de una persona joven, saludable, activa e independiente que súbitamente, a raíz del daño que se le causó, experimentó una alteración considerable en su vida.

De otro lado, en lo tocante al segundo señalamiento de error, pese a la relación de hechos que hemos elaborado, la adjudicación de la negligencia de la Farmacia Belmonte y la delimitación del daño que sufrió la señora Semidey Ramos, es meritorio abordar ahora la negligencia de los demandantes-recurridos que contribuyó a sus daños. Luego de un examen sosegado y desapasionado de la totalidad de la prueba que obra en el expediente, nuestra apreciación devela que los peticionarios fueron negligentes únicamente en un **50%**, mientras los demandantes-recurridos responden por el otro **50%** como consecuencia de su propia culpa. Veamos.

Como han argumentado los peticionarios, ellos no son responsables por la totalidad de los perjuicios de la señora Semidey Ramos por la no ingesta del medicamento Xarelto. Es imperativo imponerles responsabilidad igualmente a sus

---

[49] La utilización de ese precedente redundó en una compensación exageradamente alta.

familiares. En particular, **la señora Acevedo Semidey conocía de los serios padecimientos de su madre y que requería de sus medicamentos para tratarlos.** Aun así, una vez la señora Semidey Ramos fue dada de alta el 22 de marzo de 2013, en vez de acudir a una farmacia ese día para que se procesaran las recetas que se le entregaron, la señora Acevedo Semidey **decidió hacerlo el próximo día.** En torno al medicamento Xarelto —el cual sabía que su madre necesitaba para tratar su condición de coágulos—, llevó la receta que lo contenía el 23 de marzo de 2013 por la noche, cuando ya la Farmacia Belmonte había cerrado y en donde se le indicó que no se le podía procesar al momento, sino posteriormente. En cambio, la señora Acevedo Semidey optó por dejar la receta allí conociendo que el medicamento no se le entregaría instantáneamente.

Más adelante, la señora Acevedo Semidey **demoró tres (3) días** en llamar —el 26 de marzo de 2013— para dar seguimiento a la receta. Una vez esta se despachó finalmente el 28 de marzo de 2013, cuando se le hizo entrega de los medicamentos al señor Torres Rodríguez, este no verificó que le hayan entregado todos los medicamentos de la receta y, en específico, el Xarelto. Tampoco lo hizo subsiguientemente la señora Acevedo Semidey.

La Farmacia Belmonte falló al no despachar el medicamento y al no dar aviso sobre la autorización que se

sometió al plan médico.[50] Sin embargo, **los familiares de la señora Semidey Ramos también fallaron al no haber sido diligentes en procurar que se tramitara oportunamente la receta que contenía el medicamento Xarelto**. Ello contribuyó a la dilación en la ingesta del medicamento en cuestión por parte de la señora Semidey Ramos. **Concluimos, pues, que, a base de estos elementos, los demandantes-recurridos incurrieron en responsabilidad en un 50% en concepto de negligencia comparada.**

Con el cuadro anterior, nos corresponde examinar casos comparables a esta situación fáctica, para compensar de forma adecuada y proporcional a la señora Semidey Ramos por los daños que sufrió. Una vez identifiquemos las sumas otorgadas en los casos examinados, estas deben ser ajustadas a su valor presente y, así, determinamos la cuantía a la que es acreedora la parte agraviada. Ello, según mandata la metodología que hemos adoptado para el cómputo del valor de los daños.[51] Como

---

[50] Según razonó el Tribunal de Apelaciones, de la Ley de Farmacia de Puerto Rico se desprende el deber del profesional farmacéutico de orientar al paciente sobre el uso y despacho del medicamento, lo que implica, a su vez, brindar cualquier información que sea necesaria y significativa para optimizar la farmacoterapia del paciente. *Apéndice del certiorari*, págs. 1059-1061. Véase también: Ley de Farmacia de Puerto Rico, Ley Núm. 247- 2004, 20 LPRA sec. 407 et seq. Así, el foro apelativo intermedio estimó que la Farmacia Belmonte se apartó de ese deber al no indicarles a los familiares de la señora Semidey Ramos que no se le había despachado el medicamento Xarelto. *Apéndice del certiorari*, pág. 1064.

[51] Para actualizar las partidas a su valor presente, se utiliza el cambio que ha tenido el poder adquisitivo del dólar a través del tiempo, que toma como base el índice de precios al consumidor, para obtener el ajuste por inflación. Rodríguez Ramos v. Hospital Dr. Susoni, 186 DPR 889, 910-911 (2012). El valor adquisitivo del dólar se obtiene del índice

último paso, restaremos a la cuantía el por ciento de negligencia de los demandantes-recurridos.

En Deynes v. Texaco Puerto Rico, Inc., 92 DPR 222 (1965), concedimos una indemnización de $5,000 a una persona que se encontraba en un puesto de gasolina y que, al dirigirse al baño, se tropezó con un objeto que se encontraba en el suelo, ocasionándole una fractura en el húmero derecho. Estuvo hospitalizada cuatro días y su brazo estuvo enyesado por algún tiempo, y tuvo que someterse a tratamientos de fisioterapia. Asimismo, sufrió una pérdida de un cuarenta por ciento de la capacidad de movimiento del hombro derecho. Al hacer el cálculo correspondiente, el valor presente de $5,000 refleja $25,357.[52]

---

de precios al consumidor. El Departamento del Trabajo y Recursos Humanos es la entidad encargada de hacer disponible esa información. Los índices actuales emplean como año base el 2006. Véase: https://estadisticas.pr/en/inventario-de-estadisticas/indicedepreciosal consumidor. Con lo anterior, se procede a realizar lo siguiente. Primero, al examinar la partida otorgada en el caso previo, se tiene que considerar el año en que se otorgó. Se debe identificar cuál fue el valor adquisitivo del dólar en ese año y ello multiplicarlo con la cuantía concedida en dicho caso. Segundo, ese total obtenido se debe actualizar al año en que se dictó sentencia en el caso presente. A tal efecto, se divide ese total entre el valor adquisitivo del dólar del año en que dictó sentencia en el caso actual. El resultado es la suma actualizada a su valor presente. Rodríguez Ramos v. Hospital Dr. Susoni, supra, págs. 918-920.

[52] El índice de precios al consumidor para el 1965 es 23.50, por lo que el valor adquisitivo del dólar se computa de la forma siguiente: 100/23.50 = $4.26. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $5,000 x $4.26 = $21,300. Como segundo paso, dividimos el ajuste por inflación ($21,300) entre el valor adquisitivo del dólar para el 2020 ($0.84) y obtenemos $25,357 como valor presente de la cuantía concedida en el 1965.

Más adelante, en Negrón v. Municipio de San Juan, 107 DPR 375 (1978), un señor acudió al Hospital Municipal de San Juan para que ser atendido de emergencia. Había recibido una herida punzante en el costado derecho. Unas radiografías que le tomaron revelaban la existencia de un área de opacidad en la región afectada. No se investigó ni se hizo determinación alguna sobre ello, siendo dado de alta. Como continuó sintiendo dolor y molestias a pesar del tratamiento ambulatorio que le fue prescrito, posteriormente se le hicieron nuevas radiografías que revelaron la misma condición, es decir, la existencia de un cuerpo extraño en la región. En la intervención quirúrgica que se le practicó se le extrajo un pedazo de la hoja de un cuchillo.

La prueba pericial médica estableció que, de haberse extraído el pedazo de cuchillo al ser atendido originalmente, el paciente hubiese recuperado de su herida en una o dos semanas. No obstante, la recuperación se retardó hasta una o dos semanas después, cuando el señor volvió a trabajar. Este se vio afectado al tener que depender de la poca ayuda que recibía de un seguro. Por estos hechos demandó al Municipio de San Juan. Este Tribunal modificó la cuantía que le había otorgado el foro primario en concepto de sufrimientos físicos y mentales y le concedimos finalmente $5,000. El valor presente de esa cuantía es $12,797.[53]

---

[53] El índice de precios al consumidor para el 1978 es 46.46, por lo que el valor adquisitivo del dólar es $2.15. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $5,000 x $2.15 = $10,750. Como segundo paso,

Luego, en <u>SLG Agosto-Fernández v. F.W. Woolworth & Co.</u>, 143 DPR 76 (1997), una señora, su cónyuge y la sociedad legal de gananciales compuesta por ellos demandó a un comercio por unas desavenencias que tuvo con el gerente de este por el método de pago de una mercancía que iban a comprar. El gerente indicó, en un tono hostil y agresivo, que no aceptaría el método de pago. Debido a ello, la señora se sintió intimidada, sufrió vómitos y se le llevó al hospital donde se le diagnosticó presión alta y se le brindó tratamiento médico. Estuvo afectada emocionalmente y deprimida por varios días. Esta Curia le concedió $6,000 por las angustias mentales que experimentó. El valor presente es $8,857.[54]

A la luz de los casos comparables reseñados, y luego de tomar en cuenta los diversos factores que inciden en el cómputo del valor de los daños de la señora Semidey Ramos, estimamos que **$17,000** es una suma que compensa adecuadamente el agravio que esta sufrió, es decir, las dolencias físicas, incomodidades y angustias mentales que experimentó a raíz de la no ingesta del medicamento Xarelto. Al restarle el por ciento por la negligencia de sus familiares, la indemnización a otorgársele es **$8,500**.

---

dividimos el ajuste por inflación ($10,750) entre el valor adquisitivo del dólar para el 2020 ($0.84) y obtenemos $12,797 como valor presente de la cuantía concedida en el 1978.

[54] El índice de precios al consumidor para el 1997 es 80.78, por lo que el valor adquisitivo del dólar es $1.24. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $6,000 x $1.24 = $7,440. Como segundo paso, dividimos el ajuste por inflación ($7,440) entre el valor adquisitivo del dólar para el 2020 ($0.84) y obtenemos $8,857 como valor presente de la cuantía concedida en el 1997.

### ii. <u>Sra. Evelyn Acevedo Semidey</u>

La señora Acevedo Semidey —hija y cuidadora principal de la señora Semidey Ramos— testificó que sus daños fueron los siguientes: (a) profunda tristeza y sufrimiento por ver a su madre estando encamada, y (b) grandes preocupaciones por su cuidado.[55]

Sin duda, la señora Acevedo Semidey experimentó, naturalmente, angustias mentales compensables por el sufrimiento de su madre. Ahora bien, para propósitos de la indemnización a la que es acreedora, **las angustias que experimentó deben delimitarse a los daños específicos que la Farmacia Belmonte le causó a la señora Semidey Ramos.** Entiéndase, la compensación no se puede extender al tiempo que la señora Semidey Ramos estuvo encamada posterior al evento culposo ni a su muerte pues, como aclaramos, ello no es atribuible a la no ingesta del medicamento Xarelto. Así pues, procede que examinemos los casos comparables a la situación de la señora Acevedo Semidey.

En <u>Resto Casillas v. Colón González</u>, 112 DPR 644 (1982), se indemnizó a los hijos de un señor que sufrió una contusión en la espalda y el cuello a causa de un accidente de tránsito. El evento le causó esguince cervical severo y miositis crónica. Como consecuencia, su salud mental degeneró y culminó en un diagnóstico de esquizofrenia tipo indiferenciada. Se determinó un 45% de incapacidad mental y

---

[55] *Transcripción de la prueba oral*, Apéndice del *certiorari*, págs. 587-591.

un 25% de incapacidad de funciones fisiológicas. A base de ello, se les concedió $5,000 a cada uno de sus hijos porque la sala sentenciadora encontró probado que estos estaban angustiados, en estado depresivo y con ansiedad. El cálculo correspondiente al valor presente es de $9,583.[56]

Años más tarde, en Quiñones López v. Manzano Posas, 141 DPR 139 (1996), el demandante fue arrollado por un vehículo de motor, lo que le ocasionó una fractura conminuta desplazada subtrocantérica del fémur, debajo del lado izquierdo de la pierna. Se le practicó una intervención quirúrgica, colocándole una placa de metal, la cual se le fijó con un total de nueve (9) tornillos. Luego de esta intervención, permaneció recluido en su hogar por espacio de seis (6) meses donde recibió un total de 156 terapias. Además, utilizó una silla de ruedas por espacio de cinco (5) meses. Por estos hechos, se les otorgó a sus hijos la cuantía de $5,000 a cada uno en concepto de sufrimientos y angustias mentales. El valor presente de esa suma es $7,440.[57]

---

[56] El índice de precios al consumidor para el 1982 es 61.93, por lo que el valor adquisitivo del dólar es $1.61. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $5,000 x $1.61 = $8,050. Como segundo paso, dividimos el ajuste por inflación ($8,050) entre el valor adquisitivo del dólar para el 2020 ($0.84) y obtenemos $9,583 como valor presente de la cuantía concedida en el 1982.

[57] El índice de precios al consumidor para el 1996 es 79.77, por lo que el valor adquisitivo del dólar es $1.25. Luego, realizamos el cómputo siguiente para obtener el ajuste por inflación: $5,000 x $1.25 = $6,250. Como segundo paso, dividimos el ajuste por inflación ($8,050) entre el valor adquisitivo del dólar para el 2020 ($0.84) y obtenemos $7,440 como valor presente de la cuantía concedida en el 1996.

De un examen de los casos anteriores, consideramos que **$8,500** es una indemnización proporcional para los daños de la señora Acevedo Semidey.[58] Al restarle el por ciento de negligencia que se les imputó a los demandantes recurridos, refleja como compensación **$4,250**.

### iii. Sr. Emilio Torres Rodríguez

El señor Torres Rodríguez, esposo de la señora Acevedo Semidey y yerno de la señora Semidey Ramos, testificó ante el juzgador de hechos que: (a) era como un hijo para la señora Semidey Ramos, y (b) que se sentía mal, embargado por la tristeza y apenado por la situación de esta.[59]

Ciertamente, de la totalidad del testimonio del señor Torres Rodríguez se puede colegir que estos daños se refieren a la situación general de la señora Semidey Ramos, y no necesariamente al incidente relacionado con el medicamento Xarelto. No obstante, sí es compensable la angustia que sufrió al ver a la señora Semidey Ramos quejándose por la falta de aire y la pierna hinchada por no haber ingerido el medicamento. Asimismo, no podemos perder de perspectiva que la señora Semidey Ramos estaba siendo cuidada en la casa del señor Torres Rodríguez y de la señora Acevedo Semidey Ramos y que él le brindaba apoyo a esta última en la atención de las necesidades de la señora Semidey Ramos.

---

[58] Sépase que, en Santiago Montañez v. Fresenius Medical, 195 DPR 476 (2016), ante los daños graves que sufrió la Sra. Ruby Navarro Santiago, se le otorgó a cada uno de sus hijos la suma de $30,000.

[59] *Transcripción de la prueba oral*, Apéndice del *certiorari*, págs. 617-624.

En nuestra casuística, son muy limitados los precedentes en los que hemos abordado y valorado propiamente los daños sufridos por yernos y nueras. El más reciente fue Santiago Montanéz v. Fresenius Medical, supra, donde este Tribunal le otorgó a cada nuera $25,000 por las angustias mentales que sufrieron por los agravios de su suegra. Según se estableció, Santiago Montañez v. Fresenius Medical, supra, es distinguible de los hechos de este caso. Allí, la agraviada principal, la Sra. Ruby Navarro Santiago, experimentó una serie de daños de extensa magnitud. **Por lo cual, los $25,000 que se concedieron a cada nuera son inaplicables a este caso.** De otra parte, esa cuantía debe ser comparada con la que le concedimos a la hija de la señora Semidey Ramos. No podemos otorgarle una cuantía mayor al señor Torres Rodríguez, pues, a diferencia de la señora Acevedo Semidey, el primero no guarda una relación de consanguinidad con la señora Semidey Ramos. Por consiguiente, entendemos que **$5,000** valora razonablemente los daños del señor Torres Rodríguez. Al hacer el ajuste correspondiente en concepto de negligencia comparada, la compensación a otorgársele es **$2,500**.

### iv. Restantes familiares de la señora Semidey Ramos

En la Demanda, otros familiares de la señora Semidey Ramos también reclamaron los daños y perjuicios que presuntamente sufrieron como consecuencia de los hechos en cuestión, a saber: **el Sr. Carlos Acevedo Semidey,**[60] **la Sra.**

---

[60] El señor Acevedo Semidey es el otro hijo de la señora Semidey Ramos. Declaró que se sintió triste, inseguro de lo

**Ana Biaggi Cruz,**[61] y **el Sr. Francis Acevedo Biaggi.**[62] Consiguientemente, el foro primario les concedió indemnización y el foro apelativo intermedio la confirmó.

Al escudriñar puntillosamente los testimonios que estas personas vertieron ante la sala sentenciadora, **no estamos convencidos de que sus daños se probaron.** Sus declaraciones, si bien abordan principalmente cómo se sintieron ante el deterioro de la señora Semidey Ramos por sus condiciones y su eventual muerte —lo cual no está relacionado con la no ingesta del medicamento Xarelto—, no pudieron particularizar qué daños —si algunos— experimentaron como consecuencia de que esta no haya ingerido un medicamento por cierta cantidad de días y que haya visitado el hospital sin haber sido admitida propiamente para hospitalización. En cuanto a este extremo, **sus testimonios fueron escuetos, adolecieron de vaguedad y estuvieron plagados de generalidades.** Por ende, no podemos conceder una compensación por unos daños que simple y llanamente no se pueden atribuir a la conducta negligente de

_____

que iba a ocurrir con la salud de su madre y preocupado porque se le dieran los tratamientos adecuados. _Transcripción de la prueba oral_, Apéndice del _certiorari_, pág. 637.

[61] La señora Biaggi Cruz es esposa del señor Acevedo Semidey y nuera de la señora Semidey Ramos. Afirmó que: (a) la señora Semidey Ramos era "más que una madre" para ella, por lo que tenían una relación estrecha; (b) le impactó fuertemente la situación de esta, y (c) se sentía desesperanzada. _Transcripción de la prueba oral_, Apéndice del _certiorari_, págs. 641-644.

[62] El señor Acevedo Biaggi es hijo del señor Acevedo Semidey y de la señora Biaggi Cruz y, en consecuencia, nieto de la señora Semidey Ramos. Atestiguó que se encontraba apenado y que había sufrido por el estado en que se encontraba su abuela. _Transcripción de la prueba oral_, Apéndice del _certiorari_, págs. 647-653.

los peticionarios. **Ante esto, procede eliminar las partidas que los foros inferiores otorgaron a estas personas, pues no se apoyan en el expediente ante nos.**

### v.   S.L.G. Torres-Acevedo

La Sociedad Legal de Gananciales Torres-Acevedo, compuesta por el señor Torres Rodríguez y la señora Acevedo Semidey (S.L.G. Torres-Acevedo), solicitó en la Demanda diversos gastos en los que incurrió en el cuidado de la señora Semidey Ramos a raíz de sus padecimientos.[63] A tal efecto, ambos cónyuges testificaron ante la sala de instancia. Mientras la señora Acevedo Semidey declaró de manera general sobre los gastos que tuvo para poder atender a su señora madre —algunos que estaban previo a la hospitalización de febrero a marzo de 2013 y otros que se exacerbaron luego de esta—,[64] el señor Torres Rodríguez no pudo especificar el incremento de estos.[65] El foro primario concedió $25,000 a la S.L.G. Torres-Acevedo, lo cual el foro intermedio confirmó. **No estamos contestes con esa determinación.**

La cuantía de la S.L.G. Torres-Acevedo por concepto de gastos no tiene apoyo en la prueba que desfiló ante el foro primario. La S.L.G. Torres-Acevedo no pudo precisar qué

---

[63] En particular, se alegó que estos experimentaron incrementos en las facturas de los servicios de energía eléctrica y agua potable, y que también aumentaron sus gastos por concepto de alimentos, deducibles de medicamentos y cuidado de la señora Semidey Ramos. Véase: *Demanda enmendada*, Apéndice del *certiorari*, pág. 54.

[64] *Transcripción de la prueba oral*, Apéndice del *certiorari*, págs. 586-587, 593.

[65] Íd., pág. 673.

desembolsos, si algunos, tuvo que realizar como consecuencia de los daños específicos que sufrió la señora Semidey Ramos. Nótese que los gastos a los que se aluden, según se desprende del expediente, surgen como consecuencia de los padecimientos de la señora Semidey Ramos antes y después de la hospitalización de febrero a marzo de 2013. **El récord ante nos está huérfano de evidencia que atribuya los gastos alegados al incidente del medicamento Xarelto.** Como resultado de este análisis, **<u>no nos queda más que eliminar la partida de $25,000 que se le otorgó a la S.L.G. Torres-Acevedo</u>** ante la ausencia total de prueba que sustente que estos se incurrieron como consecuencia del acto culposo.

B. **Tercer señalamiento de error**

En lo atinente al tercer y último señalamiento de error, los peticionarios aducen que erró el foro primario al conceder las costas solicitadas por los demandantes-recurridos y el foro intermedio al mantenerlas. En particular, impugnan las partidas que se incluyeron en el memorando de costas sobre los peritos de los demandantes-recurridos.[66] Sobre este extremo, los peticionarios son del criterio que no corresponde la inclusión de esas partidas, toda vez que esos gastos no fueron

---

[66] Específicamente, el memorando contenía las partidas siguientes: (1) los sellos de presentación de la demanda ante el foro primario y el foro apelativo intermedio = $192; (2) seis (6) emplazamientos por $45 cada uno = $270; (3) gastos periciales del Dr. Edwin Miranda Aponte y la Dra. Amarilis Laboy Vázquez = $2,100 y $4,000 respectivamente; y (4) regrabación y transcripción del juicio = $1,024. Todo ello totaliza $7,586. Véase: *Memorando de costas*, Apéndice del *certiorari*, págs. 1071-1072.

necesarios para la tramitación del pleito. Para sustentar su postura, cuestionan el contenido de los testimonios que estos peritos vertieron en el tribunal y atacan su utilidad para la adjudicación de la controversia. **No estamos de acuerdo.**

Debe quedar claro que la concesión de costas responde a un ejercicio de discreción del foro primario. No encontramos que, en este caso, este haya actuado de modo que nos veamos compelidos a intervenir con su determinación. Tras examinar el memorando de costas de los recurridos, el foro primario consideró la procedencia de las partidas de los honorarios de los peritos y finalmente las otorgó. Habida que cuenta de que del expediente no surgen indicios de abuso de discreción, prejuicio o parcialidad, o de que la sala de instancia se haya equivocado en la interpretación o aplicación de una norma procesal o de derecho sustantivo, el dictamen de esta —específicamente en cuanto al otorgamiento de costas— merece nuestra deferencia. Por consiguiente, no procede alterar la cuantía de costas otorgada. Este error no se cometió.

### IV

Por los fundamentos expuestos, se modifica el dictamen recurrido del Tribunal de Apelaciones, a los únicos fines de variar la valoración de los daños, según se consignó en esta Sentencia, a saber:

| | |
|---|---|
| **Carmen Semidey Ramos** | **$8,500** |
| **Evelyn Acevedo Semidey** | **$4,250** |
| **Carlos Acevedo Semidey** | **$0** |
| **Emilio Torres Rodríguez** | **$2,500** |

| | |
|---|---|
| **Ana Biaggi Cruz** | **$0** |
| **Francis Acevedo Biaggi** | **$0** |
| **S.L.G. Torres-Acevedo** | **$0** |

Así modificado, se confirma.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Estrella Martínez emite una Opinión Disidente a la que se unen el Juez Asociado señor Rivera García y el Juez Asociado señor Colón Pérez.


                                Javier O. Sepúlveda Rodríguez
                                Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Carmen Semidey Ramos y otros<br><br>Recurridos<br><br>v.<br><br>Farmacia Belmonte y/o Farmacia Belmonte, Inc. y otros<br><br>Peticionarios | CC-2021-0883 | Certiorari |

Opinión disidente emitida por el Juez Asociado Señor ESTRELLA MARTÍNEZ, a la cual se unen los Jueces Asociados Señores RIVERA GARCÍA y COLÓN PÉREZ.

En San Juan, Puerto Rico, a 15 de febrero de 2023.

> **"La indemnización efectiva y proporcionada del daño es pues la síntesis y el punto final de todo sistema de responsabilidad civil y en términos prácticos, la manifestación real de la existencia de tal responsabilidad".**[1]

Este Tribunal ha reiterado consecuentemente que, al valorar la concesión de daños, la brújula que orienta el camino hacia el objetivo de impartir justicia debe reflejar un balance razonable entre el daño experimentado y la posterior indemnización que se otorgue. El dictamen que hoy suscribe una Mayoría lamentablemente no refleja tal orientación.

---

[1](Negrillas suplidas). A.J. Amadeo-Murga, El valor de los daños en la responsabilidad civil, 3ra ed., España, Bosch Editor, 2019, pág. 19.

Al contrario, la <u>Sentencia</u> que hoy emite este Tribunal, pretende nublar el hecho de que la presunta corrección de la descalibrada balanza del Tribunal de Apelaciones no constituye la calibración más precisa del valor de los daños sufridos por la Sra. Carmen Semidey Ramos (señora Semidey Ramos o perjudicada) así como para el resto de sus familiares (codemandantes).

Y es que bajo la pretensión de corregir la valoración de daños exageradamente alta efectuada por los foros recurridos, el criterio mayoritario incurre en el otro extremo impermisible de este ejercicio: **conceder cuantías más bajas de lo que procede en Derecho.** Como agravante, se divide en partes iguales la negligencia incurrida por los codemandantes con respecto al patrón de omisiones culposas proseguido por la Farmacia Belmonte, cuyo efecto práctico es reducirle aún más su responsabilidad en la producción de los daños experimentados por la perjudicada.

Por entender que la <u>Sentencia</u> que hoy se emite produce un desbalance irrazonable en la administración de la justicia, disiento. En consecuencia, procedo a exponer los fundamentos que hacen imperativo distanciarme del curso de acción seguido por este Tribunal en el caso de autos.

**I**

De entrada, converjo en que procedía imponerle a los codemandantes cierto grado de responsabilidad por los

daños experimentados por la perjudicada al no procurar con la diligencia debida la tramitación de la receta en cuestión. Sin embargo, mi principal discrepancia y la que me motiva a escribir este disenso es que no puedo avalar el raciocinio de la Mayoría en cuanto a equiparar la negligencia de los codemandantes con aquella incurrida por la Farmacia Belmonte.

En cambio, considero que el mayor por ciento de negligencia debió recaer sobre la Farmacia Belmonte, entidad cuyo patrón de actos negligentes no solo propició una tardanza en el despacho de los medicamentos recetados, sino que además provocó que no se entregase un medicamento crucial para el tratamiento de las condiciones de la señora Semidey Ramos. En ese sentido, quedó demostrado que fue la Farmacia Belmonte quien se apartó en mayor grado de los deberes que le impone nuestro ordenamiento jurídico. Veamos.

La Ley de Farmacia de Puerto Rico, Ley 247 de 2004, 20 LPRA 407 et seq. (Ley de Farmacia), fue promulgada con el "propósito de promover, preservar y proteger la salud, la seguridad y el bienestar del público mediante el control y reglamentación efectivo de la práctica de farmacia […]". Íd. Del Artículo 2.02 de la ley precitada se desprende el deber profesional de todo farmacéutico de orientar al paciente sobre el uso y despacho del medicamento, lo que

implica, a su vez, brindar cualquier información que sea necesaria y significativa para optimizar la farmacoterapia del paciente. 20 LPRA sec. 407b. Asimismo, es responsabilidad de todo farmacéutico verificar una receta que va a ser despachada y de orientar al paciente o su representante al momento de recogerla. Íd.

A pesar de lo anterior, de un análisis sosegado del cuadro fáctico de esta controversia resulta evidente que la Farmacia Belmonte se apartó inexcusablemente de su responsabilidad legal. Como cuestión de hecho, la Farmacia Belmonte fue negligente al no tramitar oportunamente la receta y permitir que esta se traspapelara por un espacio de tres (3) días. Asimismo, falló al no notificar a los familiares de la señora Semidey Ramos sobre la solicitud de autorización que habían sometido al plan médico, la cual conllevaría una tardanza adicional en su despacho. Finalmente, es un hecho incontrovertido que la Farmacia Belmonte tampoco informó a los familiares que la receta que estaba despachando no incluía el medicamento anticoagulante, el cual estaba prescrito en la receta que recibió la farmacia. **Esas omisiones únicamente pueden responder a que la receta que contenía el anticoagulante no fue verificada al momento de ser despachada, según lo exige la Ley de Farmacia, <u>supra</u>.**

**Resáltese que si la Farmacia Belmonte hubiese corroborado la receta al momento realizar el despacho, se hubiese percatado de la ausencia del anticoagulante entre los medicamentos entregados y del motivo de su ausencia. Ello explica la razón por la cual no se orientó a los familiares de la perjudicada sobre las consecuencias que pudiera tener la falta de ingesta del medicamento en cuestión. Como corolario de lo anterior, la Farmacia Belmonte incumplió simultáneamente con su deber incidental de ofrecerle alguna alternativa para adquirir el medicamento y, de esta forma, no obstaculizar el tratamiento médico de la perjudicada.**

**A la luz de lo expuesto, sostengo que a la Farmacia Belmonte se le debió atribuir un setenta por ciento (70%) de responsabilidad.** Toda vez que una mayoría de este Tribunal estima lo contrario, al avalar una imposición de una responsabilidad comparada desproporcionada que aminora la responsabilidad civil de la Farmacia Belmonte, disiento.

Ello cobra mayor relevancia habida cuenta de la extrema reducción de las cuantías en daños que la Mayoría realiza, aspecto que abordo a continuación.

## II

Sabido es que "la tarea judicial de estimar y valorar los daños es difícil y angustiosa, debido a que no existe

un sistema de computación que permita llegar a un resultado exacto con el cual todas las partes queden complacidas y satisfechas". Santiago Montañez v. Fresenius Medical, 195 DPR 476, 490 (2016). De igual modo, hemos recalcado que el "ejercicio de valoración de daños involucra cierto grado de especulación y elementos subjetivos, tales como la discreción y el sentido de justicia y conciencia humana del juzgador de los hechos". Íd.

De otro lado, hemos enfatizado en que los tribunales apelativos no debemos intervenir con la valoración de daños que realiza el foro primario, salvo cuando la cuantía concedida resulte ridículamente baja o exageradamente alta. Íd.; Meléndez Vega v. El Vocero de PR, 189 DPR 123, 203 (2013). A su vez, hemos determinado que, para evaluar la valoración de daños realizada por el foro primario, debemos examinar la prueba desfilada ante ese foro y las cuantías otorgadas en casos similares resueltos anteriormente. Herrera, Rivera v. S.L.G. Ramírez-Vicéns, 179 DPR 774, 785 (2010). Esto, a pesar de que, ciertamente, no existen dos casos exactamente iguales y que cada caso es distinguible según sus circunstancias particulares. Íd.

De lo anterior se colige que, en el ejercicio de valorar daños, los extremos producen resultados irrazonables e injustos. Consecuentemente, no debemos validar que se concedan indemnizaciones que sean

exageradamente altas, así como tampoco aquellas que sean ridículamente bajas. Ello, pues como bien se reconoce en la <u>Sentencia</u> mayoritaria, "los tribunales deben buscar una **proporción razonable** entre el daño causado y la indemnización concedida, de suerte que la adjudicación sea balanceada".[2]

Siendo estos los contornos normativos en los que se enmarca nuestra facultad revisora, coincido con que era necesario ajustar las partidas concedidas por los foros recurridos en el arduo ejercicio de valorar los daños de la señora Semidey Ramos y los demás codemandantes. De igual forma, coincido con que no procedía conceder compensación a ciertos familiares de la perjudicada.[3]

Ahora bien, no puedo avalar el ajuste a las cuantías realizado por la Mayoría toda vez que estas quedaron por debajo de lo que exige una adecuada valoración de daños. **Entiéndase, si las sumas concedidas por los foros inferiores eran exageradamente altas, las indemnizaciones otorgadas por este Tribunal adolecen de ser más bajas de lo que procede en Derecho.** Un examen de las cantidades monetarias concedidas por la Mayoría a la señora Semidey Ramos y sus familiares así lo confirma. Todo lo cual nos

---

[2](Énfasis en el original). <u>Sentencia</u>, pág. 14 (haciendo referencia a <u>Blás v. Hops. Guadalupe</u>, 146 DPR 267 339 (1998)).
[3]Íd., págs. 38-41.

coloca en los extremos que consistentemente este Tribunal ha rechazado.[4]

Por lo tanto, en aras de alcanzar un resultado que reflejara un balance más razonable, es decir que no fuera exageradamente alto ni extremadamente bajo, era menester conceder las indemnizaciones que expongo a continuación.

**A. Carmen Semidey Ramos**

Para alcanzar ese monto utilizo como casos comparables Merced v. Gob. de la Capital, 85 DPR 552 (1962) y Deynes v. Texaco Puerto Rico Inc., 92 DPR 222 (1965). Merced se trató de un niño que sufrió una fractura en su brazo por el mal estado de un columpio en un residencial público. Ello le ocasionó que tuviera problemas de circulación de sangre en esa extremidad. Posteriormente, le amputaron el brazo. A consecuencia de ese suceso, los padres, por sí y en representación del niño, demandaron al administrador del residencial. Tras prevalecer en su

---

[4]Compárese, a modo de ejemplo, las compensaciones otorgadas a la señora Semidey Ramos en ambos foros. La sentencia del Tribunal de Apelaciones le concedía $225,000, mientras que la visión mayoritaria redujo esta cantidad a tan solo $8,500. **Como vemos, ambas cifras representan los extremos impermisibles al momento de efectuar una valoración de daños.** Particularmente, la cantidad concedida por la Mayoría es preocupantemente baja al considerar que, al no tomarse el medicamento anticoagulante por un periodo de nueve (9) días, la señora Semidey Ramos experimentó malestares, dolores y problemas en la circulación que le ocasionaron que su pierna derecha se hinchara y terminara siendo diagnosticada con tromboflebitis aguda.

causa de acción, este Tribunal validó el que se le otorgara como compensación la suma de $24,000, cifra que en su valor presente asciende a $130,000.[5]

Deynes es un caso en el cual el perjudicado sufrió una caída que le ocasionó fractura, hospitalización, tratamientos y pérdida de un cuarenta por ciento (40%) de movilidad en su brazo. El valor presente de la indemnización concedida es de $25,357.[6]

En vista de las circunstancias particulares de la señora Semidey Ramos, específicamente su condición en la pierna afectada y el efecto que tuvo sobre esta no ingerir el anticoagulante por nueve (9) días, estimo que la cifra

---

[5]Las partidas asignadas en casos comparables deben ser actualizadas a su valor presente conforme a la metodología establecida en Rodríguez Ramos v. Hospital Dr. Susoni, 186 DPR 889 (2012) y Santiago Montañez v. Fresenius Medical, 195 DPR 476, 490 (2016).

Para el 1962, el índice de precios al consumidor fue de 21.95. Por tanto, el valor del dólar se computa de la forma siguiente: 100/21.95= $4.55. Para obtener el ajuste por inflación realizamos el cómputo siguiente: $24,000 x 4.55 = $109,200. Finalmente, dividimos esa cantidad entre el valor adquisitivo del dólar para el 2020 ($0.84) para obtener el valor presente de la cuantía concedida en el 1962: $130,000.

[6]Nótese que este precedente es citado con aprobación en la Sentencia. La divergencia de criterios estriba en que la visión mayoritaria, principalmente, se ancla en ese precedente para valorar los daños de la señora Semidey Ramos, mientras que el Juez que suscribe conceptualiza a Deynes como el punto de partida mínimo para valorar los daños de la perjudicada.

de **$50,000** es razonable. Dicha cifra representa un balance entre el tope de <u>Merced</u> y el mínimo de <u>Deynes</u>.

### B. Evelyn Acevedo Semidey

Para alcanzar esta cifra utilizo como referencia a <u>Santiago Montañez v. Fresenius Medical</u>, supra. En ese caso, se concedió a cada uno de los hijos $30,000 por los daños graves y prolongados que sufrió su madre. Por otro lado, en <u>Merced v. Gob. de la Capital</u>, supra, a los padres del menor le concedieron una indemnización de $3,000, cifra que ajustada a su valor presente asciende a $16,250.[7]

En consecuencia, estimo adecuado concederle a la Sra. Semidey Ramos **$15,000** como indemnización.

### C. Emilio Torres Rodríguez

Atemperando el precedente de <u>Santiago Montañez v. Fresenius Medical</u>, supra, a la situación fáctica del presente caso, le concedería **$10,000** como indemnización. Debemos de mantener en perspectiva que, como yerno de la perjudicada, él estuvo con ella cuidándola, la alojó en la casa matrimonial y permaneció con ella durante el tiempo en que estuvo sufriendo los daños ocasionados por el acto culposo.

---

[7]Como vimos, para el 1962 el valor del dólar era de $4.55. Para obtener el ajuste por inflación realizamos el cómputo siguiente: $3,000 x 4.55 = $13,650. Asimismo, dividimos esa cantidad entre el valor adquisitivo del dólar para el 2020 ($0.84) para obtener el valor presente de la cuantía concedida en el 1962: $16,250.

### III

A la luz de los fundamentos expuestos, me reafirmo en que el dictamen de la Mayoría, en lugar de alcanzar un balance justiciero y razonable en la valoración de los daños en este caso, reprodujo a la inversa el defecto que pretendió subsanar.[8] Recalco que ello se magnifica por motivo de que, paralelo a la reducción irrazonable de las indemnizaciones, se dividió en partes iguales el porcentaje de negligencia atribuible a la Farmacia Belmonte y a los codemandados. Ciertamente, el dictamen mayoritario, para todos los efectos prácticos, reduce la responsabilidad civil de la Farmacia Belmonte, quien, sin duda alguna, fue la mayor causante del daño en este caso.

**En definitiva, reitero que las particularidades del caso de epígrafe exigían que este Tribunal aplicara los fundamentos de Derecho aquí expresados lo que, ciertamente, hubiese ocasionado que se reflejara un balance más justiciero entre las partidas concedidas y los daños experimentados por la perjudicada y sus familiares.**

**No obstante, el dictamen que hoy suscribe una mayoría de este Tribunal, lejos de propiciar una proporcionalidad razonable y servir de fiel de la balanza de la justicia,**

---

[8] Nótese que a las cantidades que hubiese concedido, le aplica la modificación en el por ciento de responsabilidad expuesto en el acápite I de esta Opinión disidente.

**la inclinó desmedidamente a favor de quien causó la mayor parte de los daños en esta controversia.** No puedo avalar tal derrotero.

Por tanto, disiento.


Luis F. Estrella Martínez
Juez Asociado